UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | § |
| | § |
| V. | §     SA-20-CR-00396-01-JKP |
| | § |
| ALEXANDER EMMANUEL RIOS | § |

**DEFENDANT'S MOTION TO DISMISS**

Defendant Alexander Emmanuel Rios, pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B), moves to dismiss Count One of the Indictment, which charges receipt of a firearm while under indictment, in violation of 18 U.S.C. § 922(n). *See* Doc. No. 3. The Court should dismiss the count because § 922(n) is unconstitutional under the Second Amendment, both facially and as applied to Mr. Rios, under the new standard announced by the Supreme Court in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). The only court in the Fifth Circuit to consider § 922(n)'s constitutionality since *Bruen* found it facially violates the Second Amendment. *See United States v. Quiroz*, --- F. Supp. 3d ---, 2022 WL 4352482 (W.D. Tex. Sept. 19, 2022). In support of his motion, Mr. Rios shows the following:

**I.    BACKGROUND**

On May 24, 2020, 19-year-old Alexander Rios was the passenger in a vehicle stopped by law enforcement for a minor traffic violation.[1] After questioning and a search of the vehicle, police discovered, among other things, a pistol in the back seat. Mr. Rios was arrested and allegedly stated that he had recently acquired the pistol. At the time, Mr. Rios was reportedly under felony indictment. According to government records, Mr. Rios was charged in 2018 with making a false

---

[1] This information is based on materials provided by the Government and is used only for the purposes of background. Mr. Rios does not concede the accuracy of any of these allegations.

1

alarm or report in violation of Texas law.[2] In 2019, he received a deferred adjudication, and as consequence, remained under state indictment at the time of the May 24 arrest.[3]

On September 2, 2020, a federal grand jury returned an Indictment, charging Mr. Rios with willfully receiving a firearm while under indictment for a crime punishable by more than a year in prison, pursuant to 18 U.S.C. § 922(n). Doc. No. 3.[4]

Mr. Rios is set for trial on October 3, 2022. *See* Doc. No. 88.

## II.  LEGAL STANDARD

Federal Rule of Criminal Procedure 12 provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue." FED. R. CRIM. P. 12(b)(1). If a pretrial motion presents a question of law in a case involving undisputed facts, Rule 12 authorizes the court to rule on the motion. *United States v. Flores*, 404 F.3d 320, 325 (5th Cir. 2005); *see* FED. R. CRIM. P. 12(d) (permitting the court to rule on a motion involving factual issues provided the court states its essential findings on the record); *see also*, *United States v. Hall*, 20 F.3d 1084, 1087 (10th Cir. 1994) ("a pretrial dismissal is essentially a determination that, as a matter of law, the government is incapable of proving its case beyond a reasonable doubt."). Otherwise, the court would waste resources by allowing a case to proceed to trial and later dismissing it based on the same legal argument and facts presented through a pretrial motion. *Flores*, 404 F.3d at 325.

---

[2] False alarm or report under Texas Penal Code § 42.06 is ordinarily a Class A misdemeanor, but in certain circumstances can be classified as a state jail felony. Mr. Rios has some other juvenile apprehensions, but the 2018 false alarm or report charge is the only basis for the present § 922(n) charge.

[3] *See United States v. Valentine*, 401 F.3d 609, 611 (5th Cir. 2005) ("We conclude that a Texas state defendant who is on probation pursuant to a deferred adjudication of a felony charge remains, as a matter of law, under indictment.").

[4] The Indictment's second count charges a different person with violating 18 U.S.C. § 922(g)(1). *See* Doc. No. 3.

### III.     LEGAL ARGUMENT

Section 922(n) violates the Second Amendment both facially and as applied to Mr. Rios, because restricting law-abiding citizens who are merely under indictment from obtaining firearms is inconsistent with the historical traditions of the United States.

The Second Amendment to the United States Constitution mandates that a "well regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed." U.S. CONST. amend. II. The Supreme Court held in *District of Columbia v. Heller*, 554 U.S. 570, 628 (2008), that the Second Amendment codified an individual right to possess and carry weapons, explaining that the inherent right of self-defense, particularly in the home, is central to the right. *See also McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010) (holding "that individual self-defense is the central component of the Second Amendment right.").

Following *Heller*, the Fifth Circuit "adopted a two-step inquiry for analyzing laws that might impact the Second Amendment." *Hollis v. Lynch*, 827 F.3d 436, 446 (5th Cir. 2016). First, courts would ask "whether the conduct at issue falls within the scope of the Second Amendment right." *United States v. McGinnis*, 956 F.3d 747, 754 (5th Cir. 2020) (quoting *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives [NRA]*, 700 F.3d 185, 194 (5th Cir. 2012). "To make that determination, [courts] look to whether the law harmonizes with the historical traditions associated with the Second Amendment guarantee." *McGinnis*, 956 F.3d at 754. If the conduct is outside the scope of the Second Amendment, then the law is constitutional, otherwise, courts proceed to the second step, to determine whether to apply strict or intermediate scrutiny. *Id*. After *Heller*, several courts have found that § 922(n) was constitutional, under the second step of this framework. *See, e.g., United States v. Laurent*, 861 F. Supp. 2d 71 (E.D.N.Y. 2011).

The Supreme Court has now abrogated that two-step framework. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2126-27 (2022). The Court rejected the second step of that framework and reasoned that "[s]tep one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history." *Id*. at 2127. Under the Court's new framework "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id*. at 2126. The government then "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside of the Second Amendment's 'unqualified command.'" *Id*. (citation omitted).

Under the *Bruen* framework, § 922(n) violates the Second Amendment. Under the statute, law-abiding citizens can be denied their Second Amendment rights simply because they were accused of a crime. Section 922(n) clearly affects conduct within the scope of the Second Amendment right and the restriction is inconsistent with the Nation's historical tradition of firearms regulation. Since *Bruen*, only one court in the Fifth Circuit has addressed § 922(n)'s constitutionality; this court determined that the statute violates the Second Amendment. *See United States v. Quiroz*, --- F. Supp. 3d ---, 2022 WL 4352482 (W.D. Tex. Sept. 19, 2022).

**A. The Second Amendment's plain text covers § 922(n) conduct.**

Under the new framework in *Bruen*, courts are tasked with determining, first, whether the Second Amendment's plain text covers an individual's conduct. 142 S. Ct. 2129-30. In such cases, the Constitution presumptively protects the conduct. *Id.* The burden then shifts to the Government to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id*.

4

The conduct prohibited by § 922(n)—i.e., receipt of a firearm—is clearly covered by the plain text of the Second Amendment. It impacts the core Second Amendment right to possess a firearm for self-defense. *See McDonald*, 561 U.S. at 767; *see also generally Bruen*, 142 S. Ct. 2111.[5] Receipt of a firearm is both directly protected by the Second Amendment and indirectly protected as a necessary precursor to possession of a firearm. *See Jones v. Bonta*, 34 F.4th 704, 716 (9th Cir. 2022) ("Similarly, without the right to obtain arms, the right to keep and bear arms would be meaningless . . .. For this reason, the right to keep and bear arms includes the right to purchase them."); *Laurent*, 861 F. Supp. 2d at 85 ("Unless the defendant already possesses a firearm prior to his indictment, § 922(n) does deny him the ability to keep and bear arms for the purpose of self-defense in his home."); *cf. Teixeira v. County of Alameda*, 873 F.3d 670, 682 (9th Cir. 2017) ("Commerce in firearms is a necessary prerequisite to keeping and possessing arms for

---

[5] Legislative history illustrates that the passage of § 922(n) reflected a now outdated conception of the Second Amendment, and clearly implicates those rights post-*Heller*. Congress, in passing the modern version of § 922, recognized some potential Second Amendment concerns, but those concerns were assuaged by assurances that the Second Amendment does not confer an individual right to bear arms, a position since rejected by the Supreme Court in *Heller*. The Senate Report explains:

> A number of witnesses at the hearings have raised the question of the constitutionality of Federal firearms legislation, because it would interfere with individual rights guaranteed by the second amendment of the Constitution . . . [court] decisions hold that the second amendment, unlike the first, was not adopted with the individual rights in mind, but is a prohibition upon Federal action which would interfere with the organization of militia by the states of the Union. . . . It is sometimes contended that, aside from the second amendment, there is a natural right to bear arms, or a right stemming from a State constitution. However, it is well settled that there is nothing inherent in any such right that renders it absolute. The overwhelming majority of State cases hold that the legislature may prescribe regulations and limitations with regard to the carrying of weapons. It is clear, for example, that a State law prohibiting the carrying of revolvers without a license, or forbidding possession of concealed weapons, does not violate either the Federal or that State's constitution. And it is clear that no body of citizens other than the organized State militia, or other military organization provided for by law, may be said to have a constitutional right to bear arms.

1968 U.S.C.C.A.N. 2112, 2169. Congress seemingly acknowledged that the provisions would infringe on an individual's right to bear arms but determined that no such individual right exists. That determination has since been proven incorrect.

self-defense . . . ."). Every court to consider this question, both before and after *Bruen* has agreed that § 922(n) conduct is protected by the Second Amendment. *See, e.g., Quiroz*, 2022 WL 4352482, at *3-4; *Laurent*, 861 F. Supp. 2d at 102; *United States v. Love*, No. 20-cr-20327, 2021 WL 5758940, at *3 (E.D. Mich. Dec. 3, 2021) ("Based on *Heller* and its progeny, the Court finds that § 922(n) does impose a substantial burden on Mr. Love's Second Amendment's right.").

The statute is not limited by the type of firearm, the purpose for which the firearm might be used, or the space in which the firearm may be carried. Moreover, the restriction can persist for years, as it did in Mr. Rios's case; he had been under indictment for two years at the time of the present offense. *See Laurent*, 861 F. Supp. 2d at 102 ("This burden may last for a year or more before the initial indictment is adjudicated."). The restriction on receipt amounted to a multi-year full restriction on firearm possession.[6]

The fact that § 922(n) only places a restriction on those *under indictment* as opposed to all individuals is irrelevant to this stage of the *Bruen* framework. A person's status is not relevant to whether the Second Amendment protects the conduct, but to whether historical traditions support restricting the right. In *Heller*, the Supreme Court rejected the theory that the "people" protected by the Second Amendment were limited to a subset—i.e., those in a militia. *See Heller*, 554 U.S. at 579-81, 592-600. The Court explained that when the Constitution refers to "'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset," and that there is a "strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." *Heller*, 554 U.S. at 580-81. The question has been expanded upon by one sitting Justice on the Supreme Court, who explained that a person's status—e.g., felon—is properly considered in the question of the historical tradition, rather than the existence of the right.

---

[6] Several of these facts speak to Mr. Rios's as-applied challenge specifically.

*See Kanter v. Barr*, 919 F.3d 437, 451–52 (7th Cir. 2019) (Barrett, J., dissenting), *abrogated by Bruen*, 142 S. Ct. 2111. Then-Judge Barrett reasoned that, under the language of *Heller* itself, the word "people" refers to "all Americans," meaning that even those who can be lawfully restricted, are not "categorically excluded from our national community." *Kanter*, 919 F.3d at 453. The "question is whether the government has the power to disable the exercise of a right that they otherwise possess, rather than whether they possess the right at all." *Id.* The court in *Quiroz* found the same in striking down § 922(n). *See Quiroz*, 2022 WL 4352482, at *3 ("whether the Government can restrict that specific conduct for a specific group would fall under *Bruen*'s second step: the historical justification for that regulation.").[7] The alternative would be a largely unworkable and illogical test, which required courts to determine first whether conduct is protected relative to a person's status, and ultimately reduced the entirety of the Second Amendment analysis to this initial question.[8]

In this case, the plain text of the Second Amendment applies to the conduct, regardless of whether the Court considers the "indictment" issue at this stage or the next stage of the *Bruen* framework. Even if the Court were to understand that whether a person's conduct was protected by the Second Amendment turned on a consideration of his or her status, or whether he or she was "law-abiding," courts have routinely explained that those merely under indictment are "law-abiding" citizens for these purposes. *See, e.g., Laurent*, 861 F. Supp. at 102 ("Thus, for the

---

[7] One other district court has addressed § 922(n) since *Bruen*, and also found that a person's status is not properly considered at this stage of the *Bruen* framework. *See United States v. Kays*, No. 22-cr-40, 2022 WL 3718519, at *3 (W.D. Okla. Aug. 29, 2022) ("This argument ignores the Supreme Court's emphasis on an individual's conduct, rather than status, to decide if Second Amendment protection exists. This Court declines to read into *Bruen* a qualification that Second Amendment rights belong only to individuals who have not been accused of violating any laws."). The court in *Kays* ultimately upheld § 922(n), based on an erroneous application of *Bruen*, as explained elsewhere in this Motion.

[8] The Supreme Court did not address this issue in *Bruen*, because the case involved a licensing provision rather than a complete restriction on firearm possession for those of a certain status.

purposes of construing the statute, a defendant under indictment is a 'law-abiding citizen' who remains eligible for Second Amendment protection."); *Love*, 2021 WL 5758940, at *3 ("The purchase of a firearm by a presumably innocent individual falls within the Second Amendment right as historically understood.").

Therefore, the plain text of the Second Amendment covers the conduct at issue in § 922(n), so the law is presumptively unconstitutional. *See Bruen*, 142 S. Ct. at 2126.

**B. The Government cannot meet its burden to show that § 922(n)'s restrictions on firearms for those under indictment are "consistent with the Nation's historical tradition of firearm regulation."**

Under the *Bruen* framework, when the plain text of the Second Amendment covers the conduct at issue, the burden shifts to the Government to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *See Bruen*, 142 S. Ct. at 2130. The Government cannot meet that burden.

To meet its burden, the Government must provide historical examples and support for the constitutionality of § 922(n), and the Court is "entitled to decide a case based on the historical record compiled by the parties," rather than conducting its own historical surveys. *See id*. at 2130 n.6.[9] The Government cannot rely on a select few "outlier" regulations, but must show "a tradition of broadly prohibiting" conduct in the manner of § 922(n). *See id*. at 2138, 2156.

The Supreme Court has explained that "when it comes to interpreting the Constitution, not all history is created equal. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Bruen*, 142 S. Ct. at 2136 (quoting *Heller*, 554 U.S. at 634-35). "The Second Amendment was adopted in 1791; the Fourteenth in 1868. Historical

---

[9] *See also Bruen*, 142 S. Ct. at 2150 ("Of course, we are not obliged to sift the historical materials for evidence to sustain New York's statute. That is respondents' burden.").

evidence that long predates either date may not illuminate the scope of the right if linguistic or legal conventions change in the intervening years." *Id.*[10] Similarly, the Supreme Court explained that "we must also guard against giving post enactment history more weight than it can rightly bear." *Bruen*, 142 S. Ct. at 2136. The Court expressed skepticism about reliance on laws passed long after the passage of the Constitutional Amendment and explained "to the extent later history contradicts what the text says, the text controls." *Id.* at 2137.

The Court also explained that the requisite similarity between the challenged law and historical examples in part depends on whether the problem addressed by the law has historically existed or is uniquely modern. *See Bruen*, 142 S. Ct. at 2131–33. When "a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 2131. The total handgun ban in *Heller* and public-carry restriction in *Bruen* involved this type of straightforward historical inquiry. *Id.* The *Bruen* Court did not expressly define "distinctly similar," but the historical analysis therein illustrates that the term means that statutes are nearly identical or meaningfully the same, not simply analogous or "relevantly similar."[11] On the other hand, "cases implicating

---

[10] The Fourteenth Amendment was specifically implicated in *Bruen* because it is the Fourteenth Amendment that imposes the Second Amendment's pronouncement on a state regulation or law. The Supreme Court left open the question of whether the proper time-period to consider, particularly for a federal statute, is 1791, the passage of the Second Amendment, or 1868, the passage of the Fourteenth Amendment. *See Bruen*, 142 S. Ct. at 2137–38. The failure to determine the issue was specifically identified by Justice Barrett as well in her concurrence. *Id.* at 2163 (Barrett, J., concurring). Even in *Bruen*, the Court acknowledged that 19th century evidence was secondary to that from the nation's founding, *see id.* at 2137, and its value is likely even more limited when addressing a federal statute.

[11] The only historical example identified in *Bruen* as being sufficiently analogous to the challenged New York public carry statute, was a Nineteenth century Texas statute that forbade anyone from "carrying on or about his person any pistol unless he has reasonable grounds for fearing an unlawful attack on his person." *Bruen*, 142 S. Ct. at 2153 (quoting 1871 Tex. Gen. Laws § 1). The statute is effectively identical to the New York statute which required applicants to demonstrate "proper-cause" to obtain a public-carry license.

unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Id*. at 2132. "When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy . . . ." *Id*. Whether an historical regulation is a proper analogue for a uniquely modern regulation turns on whether they are "relevantly similar," based in part on how and why the regulations burden the Second Amendment right. *Id*. at 2132–33.

Here, as in *Heller* and *Bruen*, historical examples of regulations proffered by the Government must be "*distinctly* similar" to § 922(n) because the restriction does not address "unprecedented societal concerns or dramatic technological changes[.]" *See Bruen*, 142 S. Ct. at 2132–33. The restriction here is a ban on firearm receipt by those under indictment, a process that predates the Constitution itself. Whether the problem addressed is the specific danger posed by indictees or by people suspected of being dangerous more broadly, both are general societal problems that have existed at least since the founding.

The Government cannot meet its burden to show "distinctly similar" founding era laws demonstrating an historical tradition of restricting firearms for those under indictment. *See Quiroz*, 2022 WL 4352482, at *4-8. "Indictment has historically had a limited effect on an individual's constitutional rights." *Laurent*, 861 F. Supp. 2d at 91. As explained in *Laurent*, the impact on an indicted person's rights has generally been limited to detention or certain pre-trial conditions only after a judicial determination that such conditions are necessary. *Id*. at 90-93 (citing *United States v. Salerno*, 481 U.S 739, 764 (1987); 18 U.S.C. § 3142). Conversely, the history of barring indicted individuals from receiving firearms is limited and relatively recent. Congress first passed a law prohibiting transporting firearms for those under indictment for a crime of violence, in 1938. *See* Federal Firearms Act of 1938, 75 Cong. Ch. 850, § 2(e), 52 Stat. 1250, 1251 (repealed). It was not

until 1961, that Congress expanded the prohibition to include all individuals under indictment. *See* Act of Oct. 3, 1961, Pub. L. No. 87–342, 75 Stat. 757 (repealed). The statute was again clarified in 1968, to include indictments in state and federal court, but only those felonies punishable by more than one year in prison. *See* Gun Control Act of 1968, Pub. L. 90–618, 82 Stat. 1213 (codified at 18 U.S.C. § 921 *et seq.*). The Government, of course, cannot rely on the passage of § 922(n) *itself* to establish an historical tradition back to the enactment of the Second Amendment,[12] and there is no evidence of a prior tradition of disarming indictees.

Even if § 922(n) were a uniquely modern regulation, such that the Court could expand its historical analysis to include merely "relevantly similar" analogues, there is limited support in the Nation's history. Counsel anticipates that the Government will argue that § 922(n) is sufficiently analogous to laws prohibiting felons or similar persons from having firearms. The position is flawed. The *Heller* Court declined at that time to strike down "prohibitions on the possession of firearms by felons and the mentally ill . . ." 554 U.S. at 626-27. But this language is dicta and does not establish an historical tradition of disarming even felons or other individuals deemed to be dangerous. *See United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (cautioning against over-reading *Heller*'s holding). In fact, courts have recognized there is no support for the disarmament of even felons from the founding era. *See Kanter*, 919 F.3d at 454 (Barrett, J.,

---

[12] First, a statute cannot serve as its own historical analogue. Moreover, the Supreme Court specifically declined to consider <u>any</u> Twentieth century evidence offered by the respondents in *Bruen*, noting it "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *See id*. at 2154 n.28. Similarly, the handful of state laws addressing firearm receipt or possession by indictees were enacted largely in the 20th century and tend to be less restrictive than § 922(n). *See, e.g.,* Ohio Rev. Code Ann. § 2923.13(A)(2), (3) (passed in 1972 and limited to those under indictment for "offense of violence" or certain other enumerated offenses); Wash. Rev. Code § 9.41.040(2)(a)(iv) (added in 1996 and requiring those on bond pending trial for serious offenses to surrender firearms); Haw. Rev. Stat. Ann. § 134-7 (passed in 1988); *see also Potts v. State*, 526 So. 2d 104, 104 (Fla. Dist. Ct. App. 1987), *approved*, 526 So. 2d 63 (Fla. 1988) (finding statute restricting use and concealed carry of firearms by those under indictment violated state constitution).

dissenting) (noting scholars have not been able to identify any founding-era laws disarming all felons); *United States v. Booker,* 644 F.3d 12, 24 (1st Cir. 2011) (explaining modern statutes dispossessing felons of firearms bear "little resemblance to laws in effect at the time the Second Amendment was ratified[.]"). More importantly, though, felons are meaningfully different from indictees, such that any such restrictions would not be even "relevantly similar." *See Bruen*, 142 S. Ct. at 2132-33.

Nor can the Government rely on similar general public safety justifications or policies against arming "unvirtuous" or "dangerous" citizens to uphold § 922(n). The *Bruen* Court explained that the "government may not simply posit that the regulation promotes an important interest." *Bruen*, 142 S. Ct. at 2126. Moreover, a person indicted of a crime, particularly in the absence of an individualized determination about his or her dangerousness or a limitation to crimes of violence, does not pose the same inherent threat to public safety as those historically identified as "unvirtuous" or dangerous.[13] And, more importantly, specifically restricting firearm access for those under indictment is not consistent with the country's historical traditions of firearm regulation.

The only court in this Circuit to address § 922(n) since *Bruen* conducted an extensive analysis and found no historical tradition to support § 922(n). *See Quiroz*, 2022 WL 4352482, at *4-8. The court in *Quiroz* could find no statutes like § 922(n) before its passage in the 20th century, and rejected other historical analogues proffered by the Government, as insufficiently historical or

---

[13] For similar reasons, this Court should not look to historical surety statutes as analogues. The *Bruen* Court addressed a series of mid-19th century statutes requiring certain dangerous individuals to post bond before carrying weapons in public. 142 S. Ct. at 2148. In *Kays*, the district court found that such statutes provided sufficient historical support for the constitutionality of § 922(n). 2022 WL 3718519, at *4-5. That court, however, ignored the specific finding in *Bruen* that these statutes appear not to have been enforced except pretextually against black defendants, as well as the fact that such statutes were less restrictive than § 922(n) and in fact serve to prove that legislatures addressed the same problem in different ways historically. *See Quiroz*, 2022 WL 4352482, at *7-8.

"similar" to § 922(n) to satisfy *Bruen*. *See id* at *4-8. The court also explained that the limited procedural protections of grand jury proceedings and "historical misappropriation of law to pretextually and unlawfully disarm unfavored groups," provide additional cause for skepticism of § 922(n)'s constitutionality. *Id*. at *10-12.

Outside of the context of § 922(n), several district courts, including in this District, have struck down other per se restrictions on the rights of indicted individuals. *See, e.g., United States v. Torres*, 566 F. Supp. 2d 591 (W.D. Tex. 2008) (Cardone, J.) (finding the Adam Walsh Amendments, which mandated release conditions including on firearm possession for those charged with sex offenses, violated the Due Process Clause of the Fifth Amendment); *United States v. Arzberger*, 592 F. Supp. 2d 590, 602 (S.D.N.Y. 2008); *cf. United States v. Kennedy*, 593 F. Supp. 2d 1221, 1231 n.4 (W.D. Wash. 2008 (noting concern with government's position that defendants could be prohibited from possessing firearms simply because they were charged with an offense). *Arzberger*, for example, addressed the provision of the Adam Walsh Amendments forbidding possession of firearms for those charged under certain statutes. 592 F. Supp. 2d at 601-03. It explained "although the Supreme Court has indicated that this privilege may be withdrawn from some groups of persons such as convicted felons, there is no basis for categorically depriving persons who are merely accused of certain crimes of the right to legal possession of a firearm." *Id*. at 602.

Therefore, the Government cannot show that § 922(n) is consistent with the Nation's historical tradition of firearm regulation, and the Court should dismiss Count One of the Indictment because it violates the Second Amendment facially and as applied to Mr. Rios.

## IV. CONCLUSION

WHEREFORE, for the foregoing reasons, Mr. Rios requests that the Court dismiss Count One of the Indictment.

Respectfully Submitted,

MAUREEN SCOTT FRANCO
Federal Public Defender

_____
/s/ MOLLY LIZBETH ROTH
Assistant Federal Public Defender
Western District of Texas
727 East César E. Chávez Blvd., B–207
San Antonio, Texas 78206–1205
(210) 472-6700
(210) 472-4454 (Fax)
State Bar Number: 24040140

*Attorney for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of September, 2022, I electronically filed the foregoing with the Clerk of Courts using the CM/ECF system which will send notification of such filing to the following:

Karina O'Daniel and William F. Calve
Assistant United States Attorneys
United States Attorney's Office
601 N.W. Loop 410, Suite 600
San Antonio, Texas 78216

_____
 /s/ MOLLY LIZBETH ROTH
*Attorney For Defendant*

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § § | |
| V. | § § | SA-20-CR-00396-01-JKP |
| ALEXANDER EMMANUEL RIOS | § § | |

**ORDER**

On this day, the Court considered Defendant's Motion to Dismiss Count One of the Indictment, and the Court is of the opinion that the motion should be GRANTED. Accordingly, it is hereby:

ORDERED that Count One of the Indictment in this cause is DISMISSED.

SIGNED this ____ day of _____, 2022.

_____
JASON K. PULLIAM
United States District Judge